S. B. WELLS *et ux.* V. A. B. HOLLEY *et al.*

(*Knoxville.* September Term, 1921.)

FRAUD.  Purchaser's right of action for shortage in acreage held waived.

Where a farm which was represented to contain one hundred and thirty-six acres contained but one hundred and eight and two-fifths acres, the difference was sufficient, even in the absence of actual fraud, to entitle the purchaser to a rescission of his executory contract and to damages for the shortage, but when he accepted the deed, paid his money, executed his notes, and fully complied with the contract, knowing the acreage, he waived the right to damages for the deficiency, though when completing the contract he asserted his intention to claim damages.

Cases cited and approved: Smith v. Bolles, 132 U. S., 125; Sigafus v. Porter, 179 U. S., 116; Kingman & Co. v. Stoddard, 29 C. C. A., 413; People v. Stephens, 71 N. Y., 527; Selway v. Fogg, 5 Mees. & W., 83; Fitzpatrick v. Flannagan, 106 U. S., 648; Saratoga & S. R. Co. v. Row, 24 Wend., 74; McLean v. Clapp, 141 U. S., 429; Cozart v. Georgia Co., 54 Ga., 384; Gamble v. Knott, 48 Id., 109; May v. Memphis Co., 40 Id., 190.

Cases cited and distinguished: Ponder v. Altura Farms Co., 57 Colo., 519; Grymes v. Sanders, 93 U. S., 55; Hunt v. Hardwick Co., 68 Ga., 100; St. John v. Hendrickson, 81 Ind., 350.

FROM GREENE.

Appeal from the Chancery Court of Greene County.— HON. HAL H. HAYNES, Chancellor.

SWINGLE & SUSONG, for appellants.

SUSONG & BIDDLE, for defendants.

MR. L. D. SMITH, Special Justice, delivered the opinion of the Court.

This is an action for damages based upon an averment of fraud in the sale and purchase of a tract of land by the defendant to complainants. The facts necessary to be stated are:

The defendant A. H. Holley was the owner of a tract of land near Greenville, Tenn., which he desired to sell. He engaged a real estate agency, Tweed & Kelley, to find a purchaser. He represented to his agents that the tract contained one hundred and thirty-six acres, and authorized them to sell it at the price of $15,000. The complainant Wells desired to purchase a farm. He interviewed these agents and ascertained from them upon their representations that this farm contained one hundred and thirty-six acres, and, after looking at the property, entered into a contract with the defendants. This contract is in the following words:

"I, A. H. Holley, party of the first part, have this day bargained and sold my farm, containing one hundred and thirty-six acres, situated in the 24th civil district of Greene Co., Tenn., for the sum of fifteen thousand dollars— one-third to be paid on the 15th day of Dec., 1918; the balance, one, two, three, and four years of equal amounts. The following personal property goes with farm at the above price: A phone and interest in phone line, one hay fork, hay and fodder, and corn. Said Holley reserves the

right to feed his stock out of same until tke 15th of December, 1918.   Said Wells is to give said Holley fifty bushels of corn in addition to the amount used in feeding. Said Holley further agrees to give all loose lumber, boards and wood that is now on farm.   In act of good faith said S. B. Wells, purchaser of said farm, and A. H. Holley forfeits the sum of five hundred dollars, should either of them fail to comply with the above contract.

"This 20th day of Nov., 1918.

his

"A. H. x HOLLEY.

mark

"S. B. WELLS."

The proof shows that Mr. Holley had acquired this property under several deeds; that he did not know just the number of acres in it, but he really believed that it contained one hundred and thirty-six acres, and it is quite certain that his representations made to his agents were made in good faith and without any intention to actually deceive.   Before this contract was completed by the execution of the deed, Mr. Holley had a surveyor run out the lines in order to know just what description to put in his deed of conveyance.   When the land was surveyed it was ascertained that it contained only one hundred and eight and two-fifths acres, or about twenty-eight acres less than he had supposed it had contained, and which he had represented to complainant that it did contain, when the parties came to close the deal, the deed which had been drawn at the instance of the defendant Holley showed that the quantity of land was one hundred and eight and two-fifths acres.   When this was brought to the attention of the complainant he at once raised the question of short-

age in the number of acres which he had purchased, and insisted that he had bought the land by the acre. Mr. Holley, on the other hand, insisted that he had not bought it by the acre, but that he had bought it by the boundary. After considerable discussion of the question, and after complainant had consulted a lawyer, he finally agreed to accept the deed, paid the money, and executed his notes in accordance with his contract, but he says that he did it under protest, and with notice to Mr. Holley that he was reserving the right to bring suit against him for damages for misrepresentations made to him with respect to the quantity.

We concur in the views of the chancellor that the weight of the proof shows that, notwithstanding the complainant's protest, he finally accepted the deed as being in compliance with his contract. But whether he did or did not, he knew before he accepted the deed or executed his notes and paid out his money, that the tract of land did not contain one hundred and thirty-six acres, but only one hundred and eight and two-fifths acres.

The amount of the deficiency in acres was sufficient, under the rules of this court, even in the absence of actual fraud, to have entitled complainant to a rescission of the contract, and to such damages as he may have sustained by virtue of the shortage in acres. But when he accepted the deed, paid out his money, and executed his notes, and fully complied with the contract, knowing exactly what land was contained in the farm conveyed to him, he thereby waived any right he had to complain at the deficiency in acreage. Placing the proposition upon the ground as if an actual fraud had been committed, he would not be entitled to recover damages, because no damages resulted

Wells v. Holley.

to him, since he had the right and option to refuse to carry out his trade. There must be some damage before fraud can be made the basis of an action. We are aware of the fact that in some jurisdictions carrying out of an executory contract does not waive the right to recover damages for fraud and deceit, but in practically all jurisdictions the right of rescission of such a contract is lost where the party carries it out and executes it after knowledge of the fraud. The principle applicable in this case was, we think, clearly stated and applied by the United States circuit court of appeals for the sixth circuit in *Simon* v. *Goodyear, etc.,* in which opinion of the court was delivered by Mr. Justice LURTON, and from which we quote:

"The case for the plaintiff, in its most favorable showing, may be thus stated: 'The defendant has deceived and beguiled me into a contract which I would not have made but for reliance upon the willfully false statements of its agents, made to induce its execution. I discovered its deceit after beginning its execution. I could have stopped then, for the engagement was not obligatory, and by far the greater part of my contract was still executory. If I had stopped purchases and deliveries when I acquired full knowledge of the falseness of its representations, my loss would have been limited to the difference between the price I had paid for the rubber waste I had theretofore delivered and the price I received under the contract, and this loss I might have recovered in an action for deceit. But when I discovered the deceit I sought to be relieved in whole or in part from its further execution, and appealed to the defendant to make concessions. The defendant denied the deceit and demanded full performance, granting me only an extension of time for performance.

In this situation, with full knowledge of the deceit, I accepted this concession in respect to time of performance, but notified it that I would hold it liable for the loss I should incur in buying to fill my contract when it should be fully performed, and went ahead and executed the contract according to its terms. Defendant has paid me the price it agreed to pay, but I now demand the damages I have incurred in carrying out the contract according to its terms.'

"There can be but one answer to the case thus stated. The contract was not obligatory by reason of the deceit by which it was procured. If it had been fully executed before full knowledge of the deceit which made it nonobligatory, the plaintiff's remedy would have been in an action for the deceit. In such an action the measure of damages would not be the value of the contract if the representations which induced it had been true, but the loss which was incurred by reason of its execution. What the plaintiff might have gained would not have been recoverable, but only the loss which he sustained by its actual execution. *Smith* v. *Bolles,* 132 U. S., 125, 33 L. Ed., 279, 281, 10 Sup. Ct. Rep., 39; *Sigafus* v. *Porter,* 179 U. S. 116, 45 L. Ed., 113, 21 Sup. Ct. Rep., 34. . . .

"This being the rule of damages in an action by one who has been fraudulently induced to make either a contract of sale or purchase, it must follow that if one, after full knowledge of the fraud and deceit by which he had been induced to make a sale of property, goes forward and executes it notwithstanding such fraud, the damage which he thereby sustains is voluntarily incurred. The maxim *volenti non fit injuria* has application to all loss resulting from the voluntary execution of a nonobligatory contract

with full knowledge of the facts which render it voidable. Fraud without damage is not actionable. If the fraud be discovered while the contract is wholly executory the party defrauded has the option of going on with it or not, as he chooses. If he executes it, the loss happens from such voluntary execution, and he cannot recover for a loss which he deliberately elected to incur. *Kingman & Co.* v. *Stoddard,* 29 C. C. A., 413, 57 U. S. App., 379, 85 Fed., 740; *People* v. *Stephens,* 71 N. Y., 527; *Selway* v. *Fogg,* 5 Mees. & W., 83; *Fitzpatrick* v. *Flannagan,* 106 U. S., 648, 660, 27 L. Ed., 211, 215, 1 Sup. Ct. Rep., 369. In the case of *Kingman & Co.* v. *Stoddard,* cited above, a full discussion of this question and an elaborate review of the cases supposed to hold a different view will be found. The opinion is that of the circuit court of appeals for the seventh circuit, and was delivered by JENKINS, circuit judge. It is so full, clear, and satisfactory that we need not add to its reasoning. The fact that the defendant insisted upon performance and that the plaintiff intended to perform, and then sue to recover the loss growing out of performance, cannot alter the principle. The plaintiff was under no legal compulsion to go on. What he subsequently did was in execution of the contract. The deliberate execution of it was an adoption of it with knowledge of the deceit, and in contradiction of his purpose to sue for deceit practiced in its procurement. He cannot save his right to sue for fraud by notice that he will do so if he perform, and exact performance with full knowledge of the facts which rendered performance nonobligatory. Neither can the action be saved, after such voluntary performance, to the extent of the damage sustained by partial performance before full knowledge of the deceit. His duty was to 'stop short or

go on with it,' to use the expression of Judge BRONSON in *Saratoga & S. R. Co.* v. *Row,* 24 Wend., 74, 35 Am. Dec., 598.

"The execution of the contract, so far as it was executory after full knowledge of the fraud, is equivalent to an adoption of the contract with knowledge of all the facts. 'A subsequent promise, with full knowledge of the facts, is certainly equivalent to an original promise made under similar circumstances; and no one, acting with full knowledge, can justly say that he has been deceived by false representations.' *Fitzpatrick* v. *Flannagan,* 106 U. S., 660, 27 L. Ed., 215, 1 Sup. Ct. Rep., 369. In *Selway* v. *Fogg,* 5 Mees. & W., 83, 85, Baron PARKE said: 'I also think that, upon discovering the fraud (unless he meant to proceed according to the terms of the contract), the plaintiff should immediately have declared off, and sought compensation for the bygone time in an action for deceit. Not doing this, but continuing the work as he has done, he is bound by the express terms of the contract; and, if he fail to recover on that, he cannot recover at all." 105 Fed., 573, 44 C. C. A., 612, 52 L. R. A., 745, 749.

Another case in point is *Ponder* v. *Altura Farms Company,* 57 Colo., 519, 143 Pac., 570, with the reasoning of which we entirely agree, and which, applied to the facts of this case, forces the conclusion that the complainant has no right of action. The allegations of fraud in that case were these:

" 'The plaintiff was induced to enter into said contract by the false and fraudulent representations made by defendant company through certain advertisements, including those in the Rocky Mountain News and the Denver Post, stating in substance that these tracts were located

seven miles due east of the capitol building; that the purchase price included a full perpetual water right; that the ditches were all completed, and the soil guaranteed to be the best in Colorado; and that in other advertisements it was stated in substance that every tract offered for sale was under a ditch and well irrigated, and the water rights were perpetual; that with each acre sold was delivered one right equal to an acre-foot of water, which would cover all needs for all times and for every kind of crop.

" 'That, in addition to said advertisements, he was further induced into said contract by H. Pike, assistant manager in the office of defendant to whom he had stated that he knew practically nothing 'about the value of land, or the amount of water necessary to irrigate the same, and who told plaintiff that defendant company owned said lands and had ample water for irrigating all kinds of crops and trees that might be planted thereon; that the ditches were all completed, and tract No. 48 lay under one of them; that in addition to a plentiful supply of water from the High Line Canal, defendant also owned at said time a reservoir with eighty thousand acre-feet of water stored therein which would be drawn upon, and water furnished to purchasers of said lands and water, including tract No. 48, whenever asked for and needed by them for irrigation; that defendant had sufficient water, if it did not rain for three years, to irrigate all the lands sold by it; that the beauty of defendant's irrigation system was that the purchasers of water rights could get water at any time of the day or night every day in the week; that said reservoir held thirty thousand acre-feet more than they intended to sell, and that the water rights were perpetual and consisted of one acre-foot for each acre of ground,

which would cover all needs for all time; that Altura Farms, including tract No. 48, were located seven miles from the capitol building in Denver and were within two miles of the end of the car line at Aurora; that the tramway company had a franchise to build its line out to Watkins, and in order to hold it would be compelled to build as far as Altura by June, 1910; that the soil on said lands was from three to ten feet in depth, and that the best drinking water on earth could be obtained on said farms, including tract No. 48, at from thirty to forty feet in depth; that tract No. 48 was particularly adapted to the raising of all kinds of fruit, grains, and vegetables, particularly potatoes; that said Altura Farms were worth more than $200 an acre, and similar lands to these were being and had been sold, at an equal distance from Denver, for from $300 an acre and upwards; that plaintiff by cultivating said lands would be absolutely sure of netting himself at least $2,000 on said tract, because the certainty of the water right would insure a full crop each year; and that, if through sickness or failure of crops he could not meet his payments, the same would be carried over for him.'

"It was further alleged that these representations were false and known to be so by the Altura Farms Company, and that the plaintiff was ignorant of such matters and wholly relied on the alleged false representations so made."

In respect to this the supreme court of Colorado said:

"It appears that plaintiff inspected the land at least three times before entering into the contract of purchase, twice he was taken out from the city by the defendant in an automobile, and once he walked out, accompanied by his wife. In the spring of 1910 he planted the tract, or a part of it, to crops and trees, and, by reason of it being

a dry year, and because of the shortage in water for irrigation, the crops failed and many of the trees died.

"We think that the contention of the defendant in error, to the effect that if the fraud be admitted, and, if after full knowledge of the facts alleged to constitute fraud, the plaintiff insists upon a performance of such an executory contract, he thereby ratifies the contract and condones the fraud, and for such reason is barred from a recovery for damages on account of the fraud, is well sustained by the authorities. . . .

"It is the settled rule that one who has been induced through fraud to enter into a contract has the election either to rescind, tendering back that which he has received, or affirming the contract he may have his action for deceit to recover damages. But the affirmance so referred to can have relation only to the completed transaction, and that, if he become advised of the fraud perpetrated upon him in time to recede from his agreement, and yet, when with knowledge of the falsity of the representations which has induced the contract, elects to perform, and clearly manifests his intention to abide by the contract, he condones the fraud and may not recover. It has been held that the contract, being against conscience because of the fraud, is not obligatory upon him if he so elects; but if, when fully informed of the fraud, he voluntarily confirms, ratifies and performs, and exacts performance of the contract, he condones the fraud, and that such ratification, like the ratification of an unauthorized act of an agent, relates to the time of the contract, confirming it of its date and purging it of fraud. Further, that, with respect to an executory contract, one may not, after the knowledge of the fraud, continue to carry it out, exacting

performance from the other party to it, receive its ben-efits, and still pursue an action for deceit; and this be-cause continued execution with knowledge of the fraud signifies the ratification of the contract voidable for fraud, and so condones the fraud.

"This was the doctrine announced by the United States circuit court of appeals in the case of *Kingman & Co.* v. *Stoddard*, 85 Fed., 740, 29 C. C. A., 413. In the opinion in this case will be found a most exhaustive review of the authorities upon this question. It was there said:

" 'With respect to an executory contract voidable by reason of fraud, the defrauded party, with knowledge of the deceit practiced upon him, may not play fast and loose. He cannot approbate and reprobate. He must deal with the contract and with the wrongdoer at arm's length. He may not, with knowledge of the fraud, speculate upon the advantages or disadvantages of the contract, receiving its benefits, and at the same time repudiate its obligations. *Grymes* v. *Sanders*, 93 U. S., 55, 62, 23 L. Ed., 798; *McLean* v. *Clapp*, 141 U. S., 429, 35 L. Ed., 804, 12 Sup. Ct., 29.'

"In further discussing the rule and the reasons for it, the court said:

" 'The thought is well expressed in *Solway* v. *Fogg*, 5 Mees. & W., 83-85, where Lord ABINGER, C. B., said: "Sec-ondly, it was clear upon the evidence that the plaintiff had full knowledge of all that constituted the fraud in this case either before or during the work, and as soon as he knew it he should have discontinued the work and repu-diated the contract, or he must be bound by its terms." And PARKE, B., said: "I also think that upon discovering the fraud (unless he meant to proceed according to the terms of the contract) the plaintiff should immediately have de-

Wells v. Holley.

clared off, and sought compensation for the bygone time in an action for deceit. Not doing this, but continuing the work, as he has done, he is bound by the express terms of the contract, and, if he fail to recover on that, he cannot recover at all." And why not? Fraud is indeed odious, and should be condemned; but why should the defrauded party, with knowledge of the wrong perpetrated upon him, be permitted to speculate upon the wrong, enhancing the injury if the speculation prove disastrous? Why should the wrongdoer be mulcted in damages which the defrauded party has with knowledge of the fraud brought upon himself? Why should the latter be permitted to refer the injury which he has incurred with his eyes open to the original wrong by which he was induced to execute a contract which could not be enforced against him? Suppose, for example, that one, through false representations, be induced to enter into a contract to furnish the plant necessary to the operation of a mine, and to agree to expend in its development, say not less than $100,000 per annum for the term of five years; there is neither sense nor justice in holding that, after discovery of the fraud, he may continue to carry out the contract, to advance large sums of money in its performance, and, when disaster has come upon the enterprise, he may look to the original wrongdoer for reimbursement for the loss voluntarily incurred. Cases may possibly arise where the defrauded party may, by reason of the wrong, be unable to recede from his situation without prejudice. A proper rule will doubtless be found to govern such cases when they arise, but where he can safely retreat we think he should, as Judge BRONSON expresses the thought, "decide whether he will stop short or go on." '

"In *Grymes* v. *Sanders,* 93 U. S., 55, 23 L. Ed., 798, it was held that—" 'Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be as conclusively bound by the contract as if the mistake or fraud had not occurred.'

"This doctrine was reiterated and the rule reaffirmed in *McLean* v. *Clapp, supra.*  . . .

"In *Hunt* v. *Hardwick Co.,* 68 Ga., 100, the court said:

" 'Apart from the evidence submitted on the part of the plaintiff below, it must be borne in mind that this contract, which it is alleged was induced by fraud, and false representation in two very material facts, was, so far as the record shows, not complained of when these false representations were discovered, but with full knowledge of their falsity, if they existed, defendant below went forward and made payments on said note years after it matured and thus seemingly acquiesced in and ratified the alleged contract made. It is a well-settled rule that a party who is entitled to rescind a contract on account of fraud or false representations, when he has full knowledge of all the material circumstances of the case, if he freely and advisedly does anything which amounts to the recognition of the transaction, or acts in a manner inconsistent with its repudiation, it amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable, even in equity. Kerr on Fraud and Mistake, 301-305; *Cozart* v. *Georgia Co.,* 54 Ga., 384; *Gamble* v. *Knott,* 48 Id., 109; *May* v. *Memphis Co.,* 40 Id., 190.'

"It was held in *St. John* v. *Hendrickson,* 81 Ind., 350, that:

" 'Where one is induced by fraud, in the form of false representations, to enter into a contract, and afterwards, upon obtaining full knowledge of the fraud practiced upon him, and of all material facts, declines to repudiate it and expressly ratifies it, he can neither rescind nor maintain an action for damages.'

"Upon the foregoing authorities and upon principle we think the acts of the plaintiff in this case constitute a waiver of the alleged fraud, and an abandonment of the claim for damages. At the institution of this suit the plaintiff had paid but $190 of the sum of $2,000 agreed in the contract. It was his clear duty at that time, after full knowledge of the acts of fraud, if there was fraud, to have abandoned the contract and to have brought the proper action for the damage he had then sustained. He cannot insist upon the continuance of a contract covering a long future period and at the same time claim damages for the fraud that induced it.

"In the language of some of the authorities he must either stop or go on with the contract. It is manifestly unjust that he should be permitted to do both."

Under these principles it can make no difference that the complainant protested against the acceptance of the deed and execution of the contract, and asserted his intention to enforce his rights thereunder. What he contracted for was a deed conveying this land. He accepted the deed conveying the land. It is true that he was not under necessity to accept the deed, but he did do so. And he will not be permitted to accept the deed with full knowledge of the shortage of the acreage and then maintain a

right as if he had refused to accept the deed. The only damages which he sustained are such as would have resulted from the failure of the complainant to execute the deed in accordance with the original contract, and he, having accepted the deed in compliance therewith, cannot now be heard to complain of the situation which he knew and understood at the time he accepted the deed, and upon this ground, if no other, the decree of the chancellor will have to be affirmed.