Raymond V. **DERRYBERRY** and wife,
Margaret S. Derryberry,
Plaintiffs–Appellants,

v.

Steve **HILL**, Mike Hill, L.D. Hill, Individually and L.D. Hill d/b/a L.D. Hill and Sons Realty, Larry Hubbell and Larry Hubbell d/b/a Larry Hubbell Realty and Auction Sales, Defendants–Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Nov. 4, 1987.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 25, 1988.

Patrick A. Flynn, Courtney, Fleming & Holloway, P.C., Columbia, for plaintiffs-appellants.

William M. Leech, Jr., Waller Lansden Dortch & Davis, Nashville, for defendants-appellees.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiffs from the granting of defendants' Rule 41.02(2), Tenn.R.Civ.P., motion to dismiss the complaint at the close of plaintiffs' proof.

The facts out of which this controversy arose are as follows:

Plaintiffs wished to sell their 158 acre tract of land located near Spring Hill, Maury County, Tennessee (hereafter the "property").

Prior to May 14, 1985, Mr. Derryberry had discussed listing the "property" with defendant, L.D. Hill, but had not done so.

In early May 1985, defendant, Larry Hubbell, went to plaintiffs' home to solicit the listing of the "property." On May 14, 1985, Mr. Hubbell and Mr. Derryberry entered into a listing agreement for the sale of the "property" in the sum of $249,500. The agreement was with Larry Hubbell Realty, a company owned by defendant Hubbell. Mr. Derryberry preferred selling the "property" as one tract, even though Mr. Hubbell advised him that it would bring more if it were divided into smaller tracts.

Mr. Hubbell advertised the "property" but there was little interest. To Mr. Derryberry's knowledge, Mr. Hubbell only brought one potential buyer to the "property" between May 14, 1985, and June 14, 1985.

On June 14, 1985, Mr. Hubbell met with Mr. Derryberry and advised him that he and defendant Steve Hill were interested in purchasing the "property" and offered Mr. Derryberry $215,000. Mr. Derryberry rejected the offer and countered with an offer to sell for $237,500 with the understanding that plaintiffs would pay a real estate commission out of the $237,500. Mr. Hubbell did not advise plaintiffs that he would split the sales commission with L.D. Hill & Sons Realty Company. Mr. Hubbell had with him a sales contract, signed by both himself and Steve Hill, which showed the consideration to be $215,000. Mr. Hubbell informed Mr. Derryberry that he would have to present the counter-proposal to Steve Hill. But prior to leaving the plaintiffs' home, the $237,500 figure was substituted for the $215,000 and the contract was then signed by both Mr. and Mrs. Derryberry.

Approximately thirty minutes after he left plaintiffs' home, Mr. Hubbell called plaintiffs and told them that Steve Hill had agreed and that "they had a contract."

Although they were aware of them, at no time on June 14 or prior thereto did Mr. Hubbell or any other defendant discuss with Mr. or Mrs. Derryberry the fact that rumors were circulating that General Motors or some other manufacturing concern was considering Maury County as site for a

plant. There was no discussion on that date that there had been an article on the front page of *The Tennessean* on June 13, 1985, concerning the possibility that General Motors might be interested in Maury County. In fact, the front page of the June 13, 1985 edition of *The Tennessean* contained an article headlined: "GM may build in Maury: Nashville lawyer obtains land options."

The evidence is that on June 14, 1985, when they signed the sales contract, the plaintiffs were not aware of the rumors, nor had they seen any newspaper articles. They had no knowledge that any company was considering locating a plant in Maury County.

On June 15, 1985, Mr. Derryberry went to the post office to check his mail and, while there, heard several people discussing the rumors concerning the possibility that General Motors would build a plant near Spring Hill. He then obtained a newspaper, read the article, and, upon arriving home, advised his wife that they had "been had."

On June 17, 1985, Mr. Hubbell returned to plaintiffs' home with a re-typed contract. At that time, Mr. Derryberry confronted Mr. Hubbell concerning the rumors "and his understanding as to why Mr. Hubbell and Mr. Hill were in such a hurry to confer with him on the evening of the 14th and get the contract signed." Mr. Hubbell advised Mr. Derryberry that Steve Hill had told him that plaintiffs "would be angry" when they found out. Notwithstanding the knowledge that he had gained since signing the June 14, 1985 sales contract, Mr. Derryberry and his wife signed the re-typed contract on the 17th which contained the same terms and consideration as the June 14th contract. The only difference being that those matters that had been written in, including the $237,500 consideration, had been typed into the June 17 contract.

On June 26, 1985, plaintiffs, through their attorney, wrote Mr. Hubbell and Steve Hill demanding that the closing of the "property" take place on July 3, 1985. The sales contract provided that the closing would occur on or before September 14, 1985.

Mr. Derryberry testified that he chose to accelerate the closing date, hoping that defendants would be unable to raise adequate financing and would therefore not be able to close.

The closing took place on July 3, 1985, and plaintiffs were paid the purchase price less $11,875 commission, which was equally divided between Hubbell and L.D. Hill & Sons Realty Company. The "property" was deeded two-thirds to Steve Hill and one-third to Larry Hubbell.

On July 12, 1985, the plaintiffs employed Mr. Hubbell to auction their personal property. This sale was held on August 3, 1985, and the proceeds distributed to plaintiffs on August 13, 1985.

On July 29, 1985, Steve Hill and Larry Hubbell entered into a contract to sell the "property" for $790,000. That sale was consummated on August 29, 1985, and the proceeds divided according to their respective interests between Larry Hubbell and Steve Hill.

On August 15, 1985, plaintiffs filed this suit some sixteen days after General Motors announced that it had taken options on property in the Spring Hill area for its proposed Saturn plant.

Plaintiffs' single issue in this non-jury case is whether the trial court erred in granting defendants' Rule 41.02(2), Tenn.R. Civ.P., motion to dismiss the complaint at the close of plaintiffs' proof.

The motion authorized by this rule is not to be confused with a motion for directed verdict which is authorized by Rule 50, Tennessee Rules of Civil Procedure. Motions for a directed verdict are neither necessary nor proper in a case which is being tried without a jury. Motions for dismissal in non-jury cases under Rule 41.02(2), Tennessee Rules of Civil Procedure, and motions for directed verdicts in jury cases under Rule 50, Tennessee Rules of Civil Procedure, are somewhat similar, but, there is a fundamental difference between the two motions, in that, in the jury case, the judge is not the trier of facts while in the

non-jury case he is the trier of the facts. In the jury case he must consider the evidence most favorably for the plaintiff, allow all reasonable inferences in plaintiff's favor and disregard all counteracting evidence, and, so considered, if there is any material evidence to support a verdict for plaintiff, he must deny the motion. But *in the non-jury case, when a motion to dismiss is made at the close of plaintiff's case under Rule 41.02(2), the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and, if the plaintiff's case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits,* or, the trial judge, in his discretion, may decline to render judgment until the close of all the evidence. The action should be dismissed if on the facts found and the applicable law the plaintiff has shown no right to relief. [Emphasis supplied].

*City of Columbia v. C.F.W. Construction Co.,* 557 S.W.2d 734, 740 (Tenn.1977).

We review a Rule 41.02(2), Tenn.R.Civ.P., motion to dismiss at the close of plaintiffs' proof "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Rule 13(d), Tenn.R.App.P.

Defendants admit that there was a fiduciary relationship between themselves and plaintiffs. However, they deny there was a breach of the fiduciary duty owed to plaintiffs.

The record is clear that not one of the defendants informed plaintiffs that there were rumors concerning General Motors or that there had been an article in *The Tennessean* that options had been taken on land in the Spring Hill area by an attorney representing General Motors.

It is without question that General Motors' locating a plant in Spring Hill would enhance the value of surrounding property.

Did the defendants owe a duty to plaintiffs to inform them of the rumors and newspaper article and the possibility that if the rumors were true the value of their property might be enhanced?

For the purposes of this opinion we will assume that there was such a duty owed by defendants to plaintiffs and that they breached this duty, committing a constructive fraud.

However, even assuming the duty and the breach of the duty, we hold that the trial court correctly sustained defendants' motion to dismiss.

Plaintiffs executed the contract of sale on June 14, 1985. At the time of the execution they did not know of any rumors or have any knowledge of the June 13 article in *The Tennessean.*

On the morning of June 15, 1985, Mr. Derryberry learned that General Motors was possibly interested in Spring Hill for an automobile plant site. He also acquired and read the June 13 article in *The Tennessean.* At that time so far as the record is concerned, he knew as much about the possibility of General Motors locating in Maury County as did the defendants. But even if he did not, he knew enough that he went home and told Mrs. Derryberry we've "been had."

Notwithstanding the fact that they had "been had," plaintiffs, on June 17, reaffirmed the sales contract by signing one identical to the June 14 contract.

On June 29, 1985, they had their attorney write a letter demanding that the closing be held on July 3, 1985, even though under the sales contract defendants had until September 14, 1985, to close. The sale closed on July 3, and the plaintiffs received their money.

In *Graham v. First American National Bank,* 594 S.W.2d 723 (Tenn.App.1979), plaintiffs contracted to purchase a condominium. Prior to the execution of the deed, they moved into the condominium and, before the contract was fully executed, were aware of "a long list of defects, including plumbing problems, warping drywall, cracking bathtubs, etc." *Id.*

at 726. Nevertheless, plaintiffs went forward with the contract and then sued defendant, alleging that they had been "induced to purchase a condominium by false and fraudulent misrepresentations of the agents of defendant." *Id.* at 724.

The trial court awarded both compensatory and punitive damages on the theory that the defendant had been guilty of fraudulent misrepresentation. The defendant appealed from the award of punitive damages. We reversed, stating as follows:

> Plaintiffs each testified that before the contract was fully executed on September 29, 1976, they were aware of each of the defects set out in their complaint filed on March 10, 1978. Nevertheless, their contention is that even though they were aware of these defects, they are entitled to punitive damages from defendant since they were obligated to go forward with the contract. With this contention we cannot agree. If defendant was guilty of fraud in the inducement of the contract, plaintiffs, at their option, were entitled to a rescission. *See Smith v. Greaves,* 15 Lea. 459, 83 Tenn. 459 (1885). Here they went forward with the contract and, by so doing, waived their right to rescind the contract. "In the case of executory contracts, waiver of the right to rescission operates as a waiver of the right to maintain an action for damages for the fraud...." 37 C.J.S. *Fraud* § 69 (1943). There is good reason for this rule. To hold otherwise would permit recovery for a purely self-inflicted injury. *See Ankeney v. Brenton,* 214 Iowa 357, 238 N.W. 71, 75 (1931).

In *Wells v. Holley,* 145 Tenn. 345, 235 S.W. 430 (1921), Wells entered into an executory contract with Holley to purchase a farm containing 136 acres. The contract of sale contained a forfeit clause of $500.00 should either of the parties fail to comply with the contract. Prior to completion of the contract by execution of the deed, the land was surveyed, and the discovery was made that the farm contained only 108 acres, or some 28 acres less than had been represented to Mr. Wells. Wells was made cognizant of

this fact, and he insisted that he had purchased the farm by the acre and not by the tract. After considerable discussion Wells "agreed to accept the deed, paid the money, and executed his notes ..." *Id.* at 348, 235 S.W. at 430. Wells testified that he did those things "under protest, and with notice to Mr. Holley that he was reserving the right to bring suit against him for damages for misrepresentations made to him with respect to the quantity." *Id.* While there was no finding of fraud in the inducement, the court stated:

> Placing the proposition upon the ground as if an actual fraud had been committed, he [Wells] would not be entitled to recover damages, because no damages resulted to him, since he had the right and option to refuse to carry out his trade. There must be some damage before fraud can be made the basis of an action. *Id.* at 348–49, 235 S.W. at 431.

Plaintiffs, in their brief, say three crucial events occurred prior to their moving to Woodlake: (1) they had become legally obligated to purchase the condominium unit, (2) they had paid defendant the sum of $500.00, and (3) they had sold their home. They had not become legally obligated to purchase the condominium unit since, at their option, they had a right to rescind. *See Smith v. Greaves, supra.* While they had paid defendant the sum of $500.00, the June 26 sales contract shows this $500.00 had been paid into escrow, and they would have been entitled, upon rescission, to the return of this money. We have searched this record and find no showing that plaintiffs received anything less than the full value of the condominium they sold prior to moving to Woodlake. In *Simon v. Goodyear Metallic Rubber Shoe Co.,* 105 F. 573 (6th Cir.1900), *quoted* in *Wells v. Holley,* 145 Tenn. at 349–52, 235 S.W. at 431–32, the court said:

> The rule of damages in an action by one who has been fraudulently induced to make either a contract of sale or purchase, it must follow that if one,

after full knowledge of the fraud and deceit by which he has been induced to make a sale of property, goes forward and executes it notwithstanding such fraud, the damage which he thereby sustains is voluntarily incurred. The maxim volenti non fit injuria has application to all loss resulting from the voluntary execution of a nonobligatory contract with full knowledge of the facts which render it voidable. Fraud without damage is not actionable. If the fraud be discovered while the contract is wholly executory, the party defrauded has the option of going on with it or not, as he chooses. If he executes it, the loss happens from such voluntary execution, and he cannot recover for a loss which he deliberately elected to incur. *Id.* at 579 (citations omitted).

*Graham,* 594 S.W.2d at 726–27.

In *Gilbert v. Hunnewell, Moores & Heiskill,* 59 Tenn. 289 (1873), the Court, quoting Story on *Contracts,* stated:

It is solely at the option of the party upon whom the fraud is practiced, whether he will be bound by the agreement or not. Yet if he determine to avoid a contract because of the fund [*sic*], he must give notice of such determination to the other party within reasonable time after his discovery of the fraud; and if, with a knowledge of the fraud, he acquiesce in the contract expressly, or do any act importing an intention to stand by it, or remain silent under circumstances which plainly indicate a continuing assent thereto, he can not afterward avoid it; for practically no man is injured if he know of the deceit which is practiced and consent to it, since the deceit then becomes an agreed fact of the case. So, also, if he treat the subject-matter as his own, by selling or leasing, he can not avoid the contract on the ground of fraud, even although he should afterwards discover some new incident to the same fraud, making it more to his injury than he supposed.

*Id.* at 292–93. *See also Wyatt v. Brown,* 39 Tenn.App. 28, 281 S.W.2d 64, 68 (1955); *Tennessee Adjustment Service, Inc. v. Mil-*

*ler,* 54 Tenn.App. 313, 390 S.W.2d 696, 701–02 (1964).

In the instant case the plaintiffs discovered the alleged fraud on June 15, 1985. They were at that time entitled to a rescission. However, they did not attempt to rescind. Instead, they reaffirmed their contract on June 17, 1985, and then, through their attorney, demanded that the sale be closed on July 3, 1985. They then went through the closing on July 3, 1985, executed the deed, and accepted payment for their farm. The evidence is that at no time did they attempt to rescind nor make any complaint other than the statements that were made to Mr. Hubbell on June 17.

The Chancellor properly granted the Rule 41.02(2), Tenn.R.Civ.P., motion to dismiss.

The judgment is affirmed with costs assessed against the plaintiffs and the cause remanded to the trial court for the collection of costs and any further necessary proceedings.

CANTRELL and KOCH, JJ., concur.